IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RESE DENISE KING, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-11-901 |
| | § | |
| MICHAEL ASTRUE, | § | |
| COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] are Plaintiff's Motion for Summary Judgment (Doc. 9) and Defendant's Cross Motion for Summary Judgment (Doc. 10). The court has considered the motions, all relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's Motion be **DENIED** and Defendant's Motion be **GRANTED.**

### I.   Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner") regarding Plaintiff's claim for disability

---

[1]   This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. Doc. 5.

insurance benefits under Title II of the Social Security Act ("Act"). In the present case, Plaintiff claims to be disabled as a result of depression and migraine headaches.[2]

**A. Plaintiff's Medical Records**

Plaintiff was seen from April 4, 2002, to November 22, 2008, by George Murillo, M.D., ("Dr. Murillo"), Plaintiff's primary care physician.[3] Most of the relevant records simply noted Plaintiff's vital signs and prescription refills for Prozac, Cymbalta, Imitrex and Norco.[4] Occasionally the words "depression," "migraine," or "headache" were written in or circled on the forms.[5] Dr. Murillo's medical records did not include any testing or referrals for consultations regarding Plaintiff's long-standing complaints of headaches and depression. At the time of Plaintiff's application for disability benefits in May 2008, Dr. Murillo was the only physician seen by Plaintiff for her depression and/or headaches.

On July 21, 2008, Mark Lehman M.D., ("Dr. Lehman"), a consultative psychologist for the Disability Determination

---

[2]    Transcript of Administrative Proceedings ("Tr.") 93.

[3]    See Tr. 263-65, 267, 303, 308-11, 313, 315.

[4]    Id.

[5]    Id.

Services, performed a clinical interview and mental status exam of Plaintiff.[6]   Dr. Lehman based his evaluation solely on an interview with Plaintiff.   Plaintiff related that she obtained very little therapeutic benefit for her depression from Prozac and Cymbalta, cried daily, and isolated herself from others.[7] She slept eleven hours at night and often took a nap to escape her depression.[8]   Plaintiff also told Dr. Lehman that she suffered from weekly migraine headaches but could not afford Imitrex for the migraines.[9]

Dr. Lehman provisionally diagnosed Plaintiff with a severe major depressive disorder under partial medical control, pending the receipt of records documenting Plaintiff's symptoms, and assigned her a Global Assessment of Functioning ("GAF") score of thirty-eight.[10]   Dr. Lehman determined that Plaintiff could perform most activities of daily living with only a few

---

[6]      See Tr. 269-78.

[7]      See Tr. 273.

[8]      Id.

[9]      See Tr. 274.

[10]     See Tr. 277.  The record does not reflect if Dr. Lehman received the records that he anticipated receiving.

limitations caused by her depression.[11]   The severity of the depression was found to be enough to impact her ability to complete routine tasks, but not so much that she could not manage her own benefit check.[12]   Dr. Lehman listed Plaintiff's migraines as a contributing factor to her depression.[13]

Based on the available medical records, on July 28, 2008, Charles Lankford, Ph.D., ("Dr. Lankford") performed an assessment of Plaintiff's residual functional capacity ("RFC") using a Psychiatric Review Technique form.[14]   Dr. Lankford found that, under paragraph B criteria of the regulatory medical listing ("Listing") 12.04 "Affective Disorders," Plaintiff only had mild or moderate limitations, and no episodes of decompensation.[15]   Dr. Lankford found no evidence to establish the paragraph C criteria of Listing 12.04.[16]   In his conclusion, Dr. Lankford elaborated that, even in light of her depression,

---

[11]   See Tr. 273.

[12]   See Tr. 274, 277.

[13]   See Tr. 273.

[14]   See Tr. 279.

[15]   See Tr. 289-90; 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 (b).

[16]   See Tr. 279, 289-90; 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 (c).

4

Plaintiff could carry out simple instructions, make simple decisions, concentrate for extended periods, interact with coworkers, and respond to changes in routine.[17]

On July 28, 2008, Bonnie Blacklock, M.D., ("Dr. Blacklock") assessed Plaintiff's claim of disability based on migraine headache pain.[18] Dr. Blacklock opined that the migraines were a non-severe impairment, and that the limitations Plaintiff reported were "not fully supported by the medical and other evidence."[19]

On February 10, 2009, Plaintiff attempted suicide by overdosing on Valium and Soma, and was admitted to the Conroe Regional Medical Center ("CRMC") after being found unresponsive by her husband.[20]  Once Plaintiff was stabilized, CRMC determined that she was no longer having suicidal ideation and advised her to follow up with Dr. Murillo, as well as a psychiatrist.[21]

---

[17]     See Tr. 295.

[18]     See Tr. 297.

[19]     Id.

[20]     See Tr. 352.

[21]     Id.

Plaintiff returned for a psychiatric evaluation at the Tri-County Mental Health and Mental Retardation ("Tri-County MHMR") Services on February 17, 2009. [22] Tri-County MHMR identified several symptoms of Plaintiff's depression, including isolation, loss of interest, crying, anxiety, fatigue, irritability, and sleeplessness, but again found that she had no difficulty performing activities of daily living. [23]

Tri-County MHMR found that Plaintiff's psychiatric symptoms may have begun as early as 1983, after a hysterectomy, and that her most recent episode had been triggered by recurring bereavement over her older daughter's death two years earlier, marital discord, and her other daughter's legal troubles. [24] Based on the Tri-County MHMR's findings, Plaintiff was diagnosed with bi-polar disorder--depressed mode, and assigned a GAF score of fifty. [25] A Bipolar Disorder Symptom Scale performed on February 17, 2009, showed that Plaintiff had one symptom, depressed mood, at the "moderately severe" level, two symptoms, hostility and anxiety, at a "moderate" level, one symptom, motor

---

[22]     See Tr. 322.

[23]     Id.

[24]     See id.

[25]     See Tr. 331, 334.

6

hyperactivity, at a "very mild" level, and the remaining five symptoms were found to be not present.[26]   Plaintiff was prescribed a new medication for treatment of the bi-polar disorder.[27]

Following the ALJ's directive at the initial hearing that Plaintiff be evaluated by an internist concerning her migraines, Plaintiff saw Darnel Durand, M.D., ("Dr. Durand") for a consultative examination on March 23, 2009.[28]  Dr. Durand noted that Plaintiff reported that she had performed both a magnetic resonance imaging (MRI) and a computed tomography (CT) scan of her head, but the results were negative regarding migraines.[29] Plaintiff reported having headaches twice a week.[30] Dr. Durand also noted that Plaintiff never had seen a neurologist for the migraine headaches, and that the medications prescribed by Dr. Murillo were not prophylactic for migraine headaches.[31]

---

[26]    See Tr. 337.

[27]    See Tr. 53.

[28]    See Tr. 91, 355-66.  Notably, these records are not a part of the administrative record, thus the court cannot reliably assume that they exist.

[29]    See Tr. 355-56.

[30]    See Tr. 356.

[31]    See id.

Dr. Durand concluded that Plaintiff's symptoms were not completely consistent with migraine headaches and could evidence another type of headache, such as a tension headache.[32]   Dr. Durand filled out an Ability to do Work-Related Activities form, in which he stated that Plaintiff could sustain work activity during times when she was not experiencing a headache/migraine.[33] He also reported that Plaintiff could continuously lift and/or carry up to fifty pounds, and could sit two hours, stand three hours and walk six hours at one time without interruption.[34] He also noted that odors and fumes could cause headaches.[35]

From March 31, 2009, through September 9, 2009, Plaintiff made several follow-up visits to Tri-County MHMR.[36]   On March 31, 2009, Plaintiff's mood was assessed as more stable and her symptoms on the Bi-polar Disorder Symptom Scale were either "very mild" (two symptoms), or "not present" (eight symptoms).[37]

---

[32]    See Tr. 358.

[33]    See Tr. 360-65.

[34]    See Tr. 360-61.

[35]    See id.

[36]    See Tr. 368-401.

[37]    See Tr. 371.

On May 14, 2009, Plaintiff was still showing the same "very mild" or "not present" symptoms of bi-polar disorder.[38]   On July 9, 2009, Plaintiff was noted to have more mood fluctuation, depression and irritability and her symptoms had slightly worsened to "mild" (two symptoms), "very mild" (two symptoms) and "not present" (six symptoms).[39] The September 3, 2009 report was similar to the July 2009 report.[40]

During that same period of time, Plaintiff had five counseling sessions with Jim C. Whitley, Ed. D., ("Dr. Whitley") from June 30, 2009, to September 7, 2009.[41] On July 7, 2009, Dr. Whitley noted that Plaintiff admitted that she had abused prescription medications "to assuage the pain of her losses."[42] In the same note, Plaintiff complained of constant pain, feelings of worthlessness and being severely limited in working around the house.[43]   On August 18, 2009, Dr. Whitley recorded

---

[38]     See Tr. 394.

[39]     See Tr. 384, 387.

[40]     See Tr. 381, 384.

[41]     See Tr. 434-35.

[42]     See Tr. 434.

[43]     Id.

9

that Plaintiff had become overwhelmed by her daughter's twenty-year prison sentence, overdosed on Ambien and "basically went into a coma."[44]

On September 1, 2009, Plaintiff reported to Dr. Whitley that she had called the prison chaplain for an update on her daughter.[45] She wanted to visit her daughter but could not afford it.[46] Dr. Whitley noted that her self-esteem was very low, but not suicidal.[47] On September 7, 2009, Plaintiff saw Dr. Whitley for the last time as she reached the maximum number of counseling sessions that he would perform pro bono.[48] The session notes from that date recorded no therapeutic information.

On August 31, 2009, Dr. Whitley wrote a letter to the ALJ wherein he opined that Plaintiff was "incapacitated and incapable of gainful employment."[49] In coming to that

---

[44]     Id.

[45]     Id.

[46]     Id.

[47]     Id.

[48]     Id.

[49]     See Tr. 402.

conclusion, he relied on Dr. Lehman's report of July 2008 and Plaintiff's self-reports concerning her migraine headaches.[50]

Plaintiff returned to Dr. Murillo on October 6, 2009, and was assessed on her ability to work.[51]   Although Dr. Murillo indicated that Plaintiff still suffered from depression, he also indicated that she was capable of low-stress jobs.[52]   He noted, however, that she would miss more than four days of work per month, but did not specify whether that was due to migraine headaches or depression.[53]

On October 7, 2009, Dr. Whitley completed a psychiatric disability statement indicating that Plaintiff met the criteria of paragraphs A, B and C of Listing 12.04, Affective Disorders. Specifically, Dr. Whitley found that Plaintiff's depression was characterized by all of the applicable characteristics of paragraph A except hallucinations, and that, with respect to paragraph B, she had "marked" limitations in activities of daily living, social functioning, concentration, persistence and pace,

---

[50]   Id.

[51]   See Tr. 416-18.

[52]   See Tr. 417.

[53]   See Tr. 418.

and three episodes of decompensation.[54] Regarding paragraph C,
Dr. Whitley found that Plaintiff had repeated, extended periods
of decompensation that could recur with only marginal changes to
her environment or mental demands.[55]

Plaintiff returned to Dr. Lehman for a psychological
evaluation on January 4, 2010.[56] Dr. Lehman found Plaintiff's
abstract reasoning, insight into her problems and judgment to be
fair.[57] Plaintiff's memory was found to be mildly impaired for
recent events and moderately impaired for remote events.[58]
Nonetheless, Plaintiff was able to complete the evaluation
without a break.[59] Dr. Lehman noted that there were no recent
reported episodes of decompensation.[60] Based on her responses on
the Minnesota Multiphasic Personality Inventory ("MMPI") across
several scales, Dr. Lehman noted that she might have a tendency

---

[54]    See Tr. 409-11.

[55]    See id.

[56]    See Tr. 421.

[57]    See Tr. 425.

[58]    See Tr. 424.

[59]    Id.

[60]    See Tr. 425.

to exaggerate symptoms and/or possible comprehension/attention deficits.[61] He noted that Plaintiff tended to overreact to even minor stressors.[62] Based on his interview and observations, Dr. Lehman provisionally concluded that she had a Mood Disorder, not otherwise specified, pending receipt of records documenting symptoms.[63] He also determined her GAF score to be fifty-three.[64] On January 10, 2010, Dr. Lehman completed a statement of Plaintiff's ability to do work-related activities and found only one marked limitation--Plaintiff's ability to interact appropriately with the public.[65] The rest of Plaintiff's abilities were only moderately limited or less.[66]

### B. Testimony Before the ALJ

#### 1. Plaintiff's Testimony

Plaintiff was born on August 12, 1956, and was fifty years old on August 1, 2007, the date of the alleged onset of

---

[61]   See Tr. 427.

[62]   See id.

[63]   Id. The record does not reflect if Dr. Lehman ever received the records he anticipated receiving.

[64]   See Tr. 428.

[65]   See Tr. 430-31.

[66]   See id.

disability.[67]  Plaintiff  has  a  twelfth  grade  education.[68]
Plaintiff  testified  at  the  initial  hearing  before  the  ALJ  on
February  25,  2009.[69]   Plaintiff  explained  that  she  had  been
arrested  in  November  2006  for  possession  of  methamphetamines  and
"that's  where  my  troubles  really  got  started."[70]  At  the  time  of
her  arrest,  Plaintiff  had  worked  for  seventeen  years  in  a
medical  supply  warehouse  doing  inventory  control,  shipping,  and
receiving.[71]

Plaintiff  stated  that  she  was  laid  off  from  her  job  at  the
warehouse  on  August  1,  2007,  because  she  was  missing  too  much
work  due  to  headaches  and  also  because  she  was  making  mistakes
on  the  job.[72]   Plaintiff  sought  other  employment  but  was  unable
to  find  work,  possibly  due  to  the  felony  drug  conviction.[73]

---

[67]     See Transcript of the Administrative Proceedings ("Tr.") 47-48.

[68]     See id.

[69]     Tr. 47-68, 86-87.

[70]     Tr. 48; see Tr. 64.  Plaintiff explained that she was placed on two years probation as a result of that charge.  See Tr. 51.

[71]     See Tr. 48.

[72]     See Tr. 48-49.

[73]     See Tr. 51.

14

Plaintiff stated that she had suffered from depression since 1995 and was prescribed medication for depression by her family physician, Dr. Murillo.[74]   Plaintiff testified that she slept most of the day because she felt tired.[75]   She also disclosed that while she had trouble concentrating, she did not believe that it was an "out of the ordinary" limitation.[76]   She admitted that she was forgetful at times and, at other times, could remember things from the past.[77]

Plaintiff stated that her usual day consisted of sleeping and watching television.[78]   She was able to do household chores unless she had a migraine headache.[79]   For exercise, she walked a mile two or three times a week in her neighborhood.[80]   Plaintiff estimated that she suffered from migraine headaches twice a week

---

[74]   See Tr. 66.

[75]   See Tr. 53.

[76]   See id.

[77]   See Tr. 54.

[78]   See id.

[79]   See id.

[80]   See Tr. 57.

and the headaches lasted from one to three days.[81]  When she had
a migraine, Plaintiff confined herself to lying in a cool, dark
room.[82]  The migraines caused her to vomit.[83]  When she was not
suffering from a migraine headache, Plaintiff admitted that she
had no problem carrying out any physical activity.[84] Plaintiff
stated that she was able to play with her grandchildren and
occasionally went out to eat, to the movies or to a grandchild's
soccer game.[85]

Several weeks before the initial hearing before the ALJ,
Plaintiff disclosed that she attempted suicide using her
husband's prescription medication.[86]  Afterwards, she was
evaluated by healthcare professionals and prescribed divalproex
but had not begun to take the medication by the time of the

---

[81]     See Tr. 57, 59.

[82]     See Tr. 68.

[83]     Id.

[84]     See Tr. 67.

[85]     See Tr. 60-63.

[86]     See Tr. 60-63, 71.

16

hearing.[87]   Plaintiff also admitted that she suffered from mood swings and directed her rage at her husband.[88]

### 2. Plaintiff's Husband's Testimony

Plaintiff's husband, Lloyd King, also testified at the first hearing.[89]   He stated that Plaintiff had been treated for depression since 1995 without significant results.[90]   Mr. King stated that Plaintiff also suffered from migraine headaches once or twice a week or twice every two weeks, and the headaches lasted one to two days.[91]   When suffering with a migraine, Plaintiff stayed in a dark room, without eating.[92]   Mr. King stated that Plaintiff vomited when having headaches.[93]   Mr. King also testified that Plaintiff's depression manifested itself in up and down days that sometimes lasted two hours and at other

---

[87]   See Tr. 53, 67. Divalproex is also known as Depakote.

[88]   See Tr. 67.

[89]   See Tr. 69-76.

[90]   See Tr. 69-70.

[91]   See Tr. 72.

[92]   See Tr. 72-73.

[93]   See Tr. 73.

times lasted two days.[94]  He stated that Plaintiff was able to do yard work such as raking and removing fallen tree limbs.[95]

### 3.   Medical Expert Testimony

Daniel Hamel, Ph.D., ("Dr. Hamel"), a medical expert ("ME") testified to Plaintiff's psychological conditions at the initial hearing.[96]  Based on Dr. Lehman's findings, along with those from the Tri-County MHMR, Dr. Hamel stated that Plaintiff was suffering from a bipolar disorder at Axis II, which could often be mistaken for major depressive disorder if only seen on the depressive side of the disorder.[97]  Dr. Hamel explained that two other behavioral problems affected Plaintiff – bereavement and a partner relational issue - but could not confirm those problems to be impairments under the Listings.[98]

In regards to Dr. Lehman's assignment of a GAF score of thirty-eight,[99] Dr. Hamel noted that it was "very low".[100]  Since

---

[94]    See Tr. 74.

[95]    See Tr. 76.

[96]    See Tr. 77-83.

[97]    See Tr. 77-78.

[98]    See Tr. 79; 20 C.F.R. Pt. 404, Subpt. P, App.1.

[99]    See Tr. 269-78.

Plaintiff drove herself to her appointments, and her "mental status was noted to be largely unremarkable," Dr. Hamel concluded that the medical records were not consistent with a Listing-level impairment.[101]

   Dr. Hamel conceded that Plaintiff would be limited in her mental ability to function in a work setting, in accordance with her other GAF scores of forty-seven and fifty.[102]   However, the limits did not completely eliminate her ability to work, but rather restricted Plaintiff "to 1-2-3 steps, simple, repetitive tasks."[103]

   Dr. Hamel also opined that Plaintiff's contact with the public should be occasional or less, and that she should not be subjected to an assembly-line pace.[104]   Dr. Hamel then discussed the paragraph B criteria of Listing 12.04 with the ALJ, and found that those requirements were not met because Plaintiff did not have two or more marked limitations, or one marked

---

[100]    See Tr. 80.

[101]    See id.

[102]    See Tr. 81.

[103]    Id.

[104]    See id.

19

limitation and repeated episodes of decompensation for extended periods of time.[105]   Dr. Hamel also found that the evidence did not meet the paragraph C criteria of the same Listing.[106]

Turning to Plaintiff's complaint of migraine headaches, Dr. Hamel stated that headaches could occur as a result of psychological problems, but specifically stated that he could not comment outside his area of expertise, psychology, and thus would not comment on Plaintiff's migraines without further testing.[107]   In the subsequent discussion, Plaintiff's counsel admitted that he could not provide the ALJ with any evidence that the migraines were a medically determinable impairment, and not just a complaint.[108]

On October 8, 2009, the ALJ held a supplemental hearing and Sterling Moore, M.D., ("Dr. Moore") testified as an ME concerning Plaintiff's migraine headaches.[109]   Dr. Moore stated that the only evidence of migraines was in the records of Dr.

---

[105]   See Tr. 81-82.

[106]   See Tr. 82.

[107]   See Tr. 80, 82, 87.

[108]   See Tr. 84-85.

[109]   See Tr. 29-36.

Murillo, which noted normal exams, contained no notations about the frequency or severity of Plaintiff's complaints of headaches and recorded prescription refills for Norco and Imitrex.[110] Dr. Moore commented that the record was silent as to any emergency room treatment for headaches, clinical treatment by a neurologist, or medical testing to investigate Plaintiff's complaints of migraine headaches.[111]

Dr. Moore also reviewed Dr. Murillo's assessment of Plaintiff's ability to work[112] dated October 6, 2009, two days before the hearing.[113] Based on the medical records, Dr. Moore found that Plaintiff did not meet or equal a Listing with regards to migraine headaches.[114] Dr. Moore deferred to Plaintiff's self-report when assessing her exertional capacity

---

[110]   See Tr. 31.

[111]   See Tr. 31-35.

[112]   See Tr. 416-18.

[113]   See Tr. 32.

[114]   See Tr. 33.

and limited Plaintiff to light lifting of up to twenty pounds.[115]
He also recommended subdued lighting in her work environment.[116]

### 4.  Vocational Expert Testimony

During the initial ALJ hearing, vocational expert ("VE") Patricia Cohan testified to Plaintiff's residual ability to perform work.[117]  VE Cohan described Plaintiff's previous work experience as a warehouse clerk as medium, semi-skilled work.[118] VE Cohan testified that someone having Plaintiff's limitations, that is, the ability to perform "simple, repetitive 1-2-3 step tasks performed at a non-forced pace, involving only occasional interaction with the public," could not perform Plaintiff's past work.[119]

VE Cohan then testified about the type of work that could be performed by a hypothetical person with Plaintiff's

---

[115]   See Tr. 33-34.

[116]   See Tr. 34.

[117]   See Tr. 89-91.

[118]   See Tr. 89.

[119]   See id.

limitations.   At the initial hearing, the VE testified about jobs at both the medium and light levels of exertion.[120]

The medium-level jobs VE Cohan listed as available to someone with Plaintiff's limitations were a laundry worker, bakery worker, kitchen helper, and janitor, and there were over 4,000 of each of those jobs in the Houston area.[121]   However, each of these jobs would not allow one or two absences in a week, and if the hypothetical person had that limitation, she would be unemployable for unskilled work.[122]

VE Cohan also listed various jobs which could be performed by someone with Plaintiff's limitations at a light exertional level, such as office cleaner, assembler, and garment sorter, each of which was available in the national and regional economies.[123]   VE Cohan stated that her testimony conformed to the Dictionary of Occupational Titles.[124]

C.  **Procedural History**

---

[120]   See Tr. 89-91.

[121]   See Tr. 90.

[122]   See id.

[123]   See Tr. 91.

[124]   See Tr. 90-91.

Plaintiff filed for disability benefits on May 6, 2008, claiming an inability to work since August 1, 2007, due to depression and migraine headaches.[125]   Plaintiff meets the insured status requirement of the Act through December 31, 2012.

The Commissioner denied Plaintiff's application at the initial and reconsideration levels.[126] On October 16, 2008, Plaintiff requested a hearing before an ALJ of the Social Security Administration.[127] The ALJ granted Plaintiff's request and conducted a hearing on February 25, 2009.[128] The ALJ held a supplemental hearing on October 8, 2009, and issued an unfavorable decision on August 17, 2010, which Plaintiff appealed.[129] On January 20, 2011, the Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner.[130]   Having exhausted all

---

[125]   See Tr. 93.

[126]   See Tr. 98-101, 105-07.

[127]   See Tr. 108.

[128]   See Tr. 43-92.

[129]   See Tr. 6, 26-42.

[130]   See Tr. 1-3.

available administrative remedies,[131] Plaintiff brought this civil action for review of the Commissioner's decision.[132]

### D.  Commissioner's Decision

In his August 2010 decision, the ALJ found that Plaintiff met the requirements for insured status on the alleged onset date of disability and continuing through December 31, 2012.[133] The ALJ also found that Plaintiff had not engaged in substantial gainful activity during the relevant period and that she had a combination of severe impairments—affective mood disorder, bereavement, and partner relational problems—along with complaints of migraine headaches and an inactive case of Hepatitis B.[134] The ALJ determined that these impairments, either individually or in combination, did not meet any Listing.[135]

In reviewing the Listing criteria, the ALJ found that Plaintiff had no restrictions in her activities of daily living,

---

[131]   See Harper v. Bowen, 813 F.2d 737, 739 (5th Cir. 1987), for a summary of the administrative steps a disability claimant must take in order to exhaust her administrative remedies.

[132]   See Doc. 1, Pl.'s Compl.

[133]   See Tr. 9-11.

[134]   See Tr. 11-13.

[135]   See id.

and had moderate difficulties in social functioning and concentration, persistence or pace.[136] Because Plaintiff did not experience two or more marked limitations, or one marked limitation and repeated episodes of decompensation, the ALJ found that she did not meet the paragraph B criteria of Listing 12.04, and that there was no evidence to establish the presence of paragraph C criteria.[137] The ALJ concluded that Plaintiff had no exertional limitations.[138]

In his RFC analysis, the ALJ found that Plaintiff had mental limitations resulting in an ability to perform only "simple, repetitive 1 to 3 step tasks, . . . at a non-forced pace, . . . involving only occasional interaction with the general public."[139] In examining Plaintiff's mental limitations, the ALJ followed a two-step process wherein he first determined whether there was an underlying, medically determinable physical or mental impairment.[140]

---

[136]   See Tr. 13.

[137]   See Tr. 13-14; 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(b)-(c).

[138]   See Tr. 14.

[139]   See id.

[140]   See id.; See also 20 CFR § 404.1527.

The ALJ determined that the medically determinable conditions may have caused the alleged symptoms, but that Plaintiff's statements regarding their intensity, persistence and limiting effects were not consistent with Plaintiff's testimony about her daily activities.[141]

The ALJ gave Dr. Whitley's Psychiatric Disability Statement no weight because he found no medical records to support the findings.[142] Specifically, in light of Plaintiff's admissions that she engaged in daily personal hygiene, watched television, cooked, loaded and unloaded the dishwasher, swept, dusted, mopped, vacuumed, drove, took out the trash, played with her grandchildren, went to their sporting events and occasionally did yard work, the ALJ found that Dr. Whitley's opinion that Plaintiff was "markedly" limited in her activities of daily living, and "markedly" limited in maintaining concentration, persistence and pace to be unsupported by the record.[143]

The ALJ also ascribed little weight to the opinion of Plaintiff's primary care physician, Dr. Murillo, finding that his medical records lacked any documentation to support his

---

[141]   See Tr. 14-15.

[142]   See Tr. 15.

[143]   See id.

27

treatment of Plaintiff's headaches and depression, such notations concerning the number or severity of the headaches or the nature of her depressive symptoms.[144]

The ALJ determined that Plaintiff was unable to perform her past relevant work.[145] He then considered Plaintiff's age, education, and RFC to determine if other work was available in the national and regional economies that Plaintiff was capable of performing.[146] Based on both the exertional and non-exertional limitations that Plaintiff possessed, along with the testimony of VE Cohan, the ALJ found that Plaintiff could substantially perform other available work at the medium exertional level, such as laundry worker, bakery worker and janitor.[147] Therefore, the ALJ found that Plaintiff had not, at any time between August 1, 2007, and the time of his decision, been under a disability.[148]

## II.   Standard of Review and Applicable Law

---

[144]   See id.

[145]   See Tr. 15.

[146]   See Tr. 16-17.

[147]   See id.

[148]   See Tr. 17.

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) substantial evidence in the record supports the decision; and 2) the ALJ applied proper legal standards in evaluating the evidence.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002); Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).

**Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion," Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance." Id.  The Commissioner has the responsibility of deciding any conflict in the evidence. Id.  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.  42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.  Johnson v. Bowen, 864  F.2d 340, 343-44 (5th Cir. 1988).  In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence,

decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. Brown, 192 F.3d at 496. In other words, the court is to defer to the decision of the Commissioner as much as possible without making its review meaningless. Id.

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act. Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that

30

disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment" (3) a claimant whose impairment meets or is equivalent to an impairment listed in [the Listings] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has done in the past must be found "not disabled"; and (5) if the claimant is unable to perform [her] previous work as a result of [her] impairment, then factors such as [her] age, education, past work experience, and [RFC] must be considered to determine whether [s]he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 404.1520. By judicial practice, the claimant bears the burden of proof on the first four of the above steps, while the Commissioner bears it on the fifth. Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999); Brown, 192 F.3d at 498. If the Commissioner satisfies his step-five burden of proof, the burden shifts back to the claimant to prove she cannot perform the work suggested. Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

### III. Analysis

### A. Plaintiff's Motion for Summary Judgment

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits. Plaintiff contends that the ALJ's decision does not take into account all relevant evidence, and that the ALJ did not follow proper legal procedures. Specifically, Plaintiff argues that the ALJ erred in two ways: (1) the ALJ did not give the proper weight to Plaintiff's treating physicians and failed to give sufficient reasons for doing so; and (2) the ALJ did not follow the proper legal standards in determining the severity of her impairments, specifically her migraines.

## 1.  Weight of Treating Physician's Opinion

The opinion of a treating physician—one who is familiar with the claimant's impairments, treatments, and responses—should be accorded great weight in determining disability. See Leggett v. Chater, 67 F.3d 558, 566 (5th Cir. 1995); Greenspan, 38 F.3d at 237, cert. denied, 514 U.S. 1120 (1995). A treating physician's opinion on the nature and severity of a claimant's impairment will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." Martinez v. Chater, 64 F.3d 172, 176 (5th Cir. 1995)(quoting 20 C.F.R. § 404.1527(d)(2)). "The opinion of a specialist generally is accorded greater weight than that of a

non-specialist." <u>Paul v. Shalala</u>, 29 F.3d 208, 211 (5th Cir.
1994)(overruled on other grounds by <u>Sims v. Apfel</u>, 530 U.S. 103,
112 (2000)).

"Even though the opinion and diagnosis of a treating
physician should be afforded considerable weight in determining
disability, 'the ALJ has sole responsibility for determining a
claimant's disability status.'" <u>Martinez</u>, 64 F.3d at 176
(quoting <u>Moore v. Sullivan</u>, 919 F.2d 901, 905 (5th Cir. 1990)).
An ALJ may reject a treating physician's opinion when it is
contrary to the record evidence. <u>Id.</u> The treating physician's
opinions are not conclusive. <u>See</u> <u>Brown</u>, 192 F.3d at 500. The
opinions of a treating physician may be assigned little or no
weight when good cause is shown, such as where the treating
physician's evidence is conclusory, is unsupported by medically
acceptable clinical, laboratory, or diagnostic techniques, or is
otherwise unsupported by the evidence. <u>Greenspan</u>, 38 F.3d at
237. The more a medical source presents relevant evidence to
support an opinion, particularly signs and laboratory findings,
the more weight will be given to that source's opinion.
<u>Greenspan</u>, 38 F.3d at 238.

Social Security Regulation ("SSR") 96-2p states:

[A] finding that a treating source medical opinion is
not well supported by medically acceptable clinical
and laboratory diagnostic techniques or is
inconsistent with the other substantial evidence in

> the case record means only that the opinion is not
> entitled to "controlling weight," not that the opinion
> should be rejected. Treating source medical opinions
> are still entitled to deference and must be weighed
> using all of the factors provided in 20 C.F.R.
> 404.1527 . . . . In many cases, a treating source's
> medical opinion will be entitled to the greatest
> weight and should be adopted even if it does not meet
> the test for controlling weight.

SSR 96-2p, 1996 WL 374188. Similarly, SSR 96-5p provides, with

respect to "Medical Source Statements v. RFC Assessments," that

"[a]djudicators must weigh medical source statements under the

rules set out in 20 CFR 404.1527 . . . , providing appropriate

explanations for accepting or rejecting such opinions." SSR 96-

5p, 1996 WL 374183.

Social Security Administration ("SSA") Regulations provide

that the SSA "will always give good reasons in [its] notice of

determinations or decision for the weight [it gives the

claimant's] treating source's opinion." 20 C.F.R. §

404.1527(c)(2). In determining that a treating physician's

opinion is not entitled to "controlling weight," an ALJ should

consider the following factors:

> (1)  the physician's length of treatment of the claimant,
> (2)  the physician's frequency of examination,
> (3)  the nature and extent of the treatment relationship,
> (4)  the support of the physician's opinion afforded by the
>      medical evidence of record,
> (5)  the consistency of the opinion with the record as a
>      whole; and
> (6)  the specialization of the treating physician.

Newton v. Apfel, 209 F.3d 448, 456 (5th Cir. 2000); see also 20 C.F.R. § 404.1527(c)(2)-(c)(6).

Here, the ALJ specifically stated in his opinion that he had considered the opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527.  Although the ALJ did not specifically list out the factors and address them individually, he did provide his reasons for discounting the opinions of Plaintiff's both treating physicians, Dr. Murillo and Dr. Whitley.

In assigning no weight to Dr. Whitley's opinion, the ALJ supported his decision with the fact that Dr. Whitley's opinion was patently inconsistent with Plaintiff's own testimony about her daily activities.  In addition, the ALJ stated that Dr. Whitley provided no medical records to support his decision.  An ALJ is required to consider each factor under section 404.1527 (c)(2)-(c)(6), but is not required to list out each factor in his opinion.  See 20 C.F.R. § 404.1527 (c)(2)-(c)(6).  Based on the ALJ's claim that he considered the evidence in accordance with the regulation, along with his rationale based on the fourth and fifth factors—the absence of medically acceptable clinical and laboratory techniques and the inconsistency of the opinion with Plaintiff's testimony--the court finds that the evidence substantially supports the ALJ's decision to give no

35

weight to Dr. Whitley's opinions.   See, Greenspan, 38 F.3d at 237; 20 C.F.R. 404.1527(c)(2)-(c)(6).

After the hearings, Dr. Whitley provided session notes, which the Appeals Council reviewed and determined insufficient as a basis for upsetting the ALJ's decision.  Dr. Whitley's notes, consisting of several sentences for each session, did not refute the ALJ's reasoning and did not support Dr. Whitley's opinion that Plaintiff was incapacitated and incapable of gainful employment.  Notably, at one point, Dr. Whitley recorded that Plaintiff admitted abusing prescription medication "to assuage the pain of her losses."[149]   Thus, the Appeals Council had an ample basis upon which to conclude that Plaintiff's complaints of headache pain were merely a ruse to obtain hydrocodone (Norco) and other prescription medication.   Dr. Whitley's records were appropriately dealt with by the Appeals Council.

With respect to Dr. Murillo's opinion, the ALJ properly gave it very little weight based on the scant information documenting the reasons for his medical treatment of Plaintiff. The records show little more than Plaintiff dutifully returned to Dr. Murillo each month or two for prescription refills. Furthermore, Dr. Murillo's opinion was not well-supported by

---

[149]    Tr. 434.

medically   acceptable   clinical   and   laboratory   diagnostic techniques,   and   thus   was   not   entitled   to   controlling   weight   in the ALJ's decision.

Plaintiff   also   argues   that   the   ALJ   failed   to   give   proper weight   to   the   Tri-County   MHMR   treatment   she   received,   and   also that   the   ALJ   incorrectly   reflected   her   time   spent   there.   The   ALJ addressed   Plaintiff's   treatment   at   the   Tri-County   MHMR   center, and   made   no   mention   of   deducting   weight   from   the   doctor's opinion.   Plaintiff   complains   that   the   ALJ   incorrectly   stated that   she   began   treatment   at   the   center   in   March   2009.   As outlined   above,   although   Plaintiff's   initial   referral   assessment at   the   Tri-County   MHMR   treatment   center   occurred   in   February 2009,   following   her   suicide   attempt,   her   regular   treatment   did not   begin   until   March   2009.   This   inconsistency   is   not   a   fatal error.

The   ALJ   took   into   account   the   proper   considerations   in determining   the   weight   he   would   accord   each   treating   physician. His   decision   was   supported   by   substantial   evidence   under   both tests   set   forth   in   the   Fifth   Circuit   for   discounting   the   weight of   a   treating   physician's   opinion.   Therefore,   the   court   finds that   the   ALJ   complied   with   20   C.F.R.   §   404.1527,   and   that   his conclusions   were   supported   by   substantial   evidence.

**2.  Existence and Severity of Impairment**

37

An impairment exists if it "result[s] from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 404.1508.  "A claimant's subjective statement of symptoms is insufficient, standing alone, to establish a physical or mental impairment.  See id.; 20 C.F.R. § 404.1528(a)(defining "symptom" and stating that symptoms "are not enough to establish that there is a physical or mental impairment.").

To establish an impairment, one must also show that signs and laboratory findings exist.  "Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from [one's] statements (symptoms)" and "[t]hey must also be shown by observable facts that can be medically described and evaluated."  20 C.F.R. § 404.1528(b).  "Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of a medically acceptable laboratory diagnostic techniques".  20 C.F.R. § 404.1528(c).

The ALJ must consider subjective evidence of pain, but it is within his discretion to determine the pain's disabling nature.  See Jones, 702 F.2d at 621-22; Scharlow v. Schweiker, 655 F.2d 645, 648 (5th Cir. 1981).  Such determinations are entitled to

38

considerable deference. <u>James v. Bowen</u>, 793 F.2d 702, 706 (5th Cir. 1986). "Disabling pain must be constant, unremitting, and wholly unresponsive to therapeutic treatment." Wren, 925 F.2d at 128 (citing <u>Haywood v. Sullivan</u>, 888 F.2d 1463, 1470 (5th Cir. 1989)). However, an ALJ may also conclude that a claimant's complaints of pain or "subjective symptomology" is not borne out by the credible medical findings of record. <u>Id.</u> at 129.

In determining the severity of an impairment, the Fifth Circuit now looks to the following standard: "[A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." <u>Estran v. Heckler</u>, 745 F.2d 340, 341 (5th Cir. 1984); <u>Stone v. Heckler</u>, 752 F.2d 1099, 1101 (5th Cir. 1985)(quoting and adopting the standard set forth in <u>Estran</u>).

The court in <u>Stone</u> noted that the Fifth Circuit would "in the future assume that the ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to [the <u>Stone</u>] opinion or another of the same effect, or by an express

statement that the construction we give to 20 C.F.R. § 404.1520(c) is used." Stone, 752 F.2d at 1106.

Plaintiff asserts that the ALJ erroneously ruled that her migraines were non-severe. However, Plaintiff fails to address the crucial step that the ALJ took prior to determining that her migraines did not rise to the level of a 'severe' impairment, wherein he noted that there was no objective evidence to support Plaintiff's claims of migraines.

The Code of Federal Regulations clearly states that an "impairment must be established by medical evidence consisting of signs, symptoms, *and* laboratory findings." 20 C.F.R. § 404.1508 (emphasis added). Plaintiff's medical records indicated only her subjective complaints of symptoms related to migraines and her later admission that she abused prescription medications for her own reasons. However, there was neither objective medical evidence indicating that Plaintiff had any observable signs of migraine headaches, nor any diagnostic test performed that showed an existence of a condition that might trigger migraine headaches.[150]

---

[150]   But see Wiltz v. Barnhardt, 484 F.Supp.2d 524, 532-33 (W.D. La. 2006) (holding that migraine headaches are unsusceptible to diagnostic testing, and that since laboratory tests cannot prove a migraine headache, the plaintiff's symptoms—nausea, vomiting, photophobia, dizzy spells, and blackouts—were sufficient as objective evidence to prove the existence of migraines).

Because the record does not contain any objective evidence of Plaintiff's headaches, and does not indicate a medically determinable impairment to which the headache pain reasonably could be linked, there is substantial evidence to support the ALJ's decision that Plaintiff's migraines were not a severe impairment.

Furthermore, Plaintiff's alleged migraines did not begin at the onset of her disability, but rather were documented as early as April 2002. From April 2002 until August 2007, Plaintiff held the same job, and her pain was managed by prescriptions of Norco and Imitrex. In December 2005, Plaintiff's Imitrex prescription was increased from 50 mg. to 100 mg., and was never increased after that date.[151]

The only documented change that occurred in Plaintiff's life between the first documentation of her headaches and the alleged onset of her disability—aside from her complaints that her migraines had become disabling—was her termination from employment in August 2007. Plaintiff alleged that she was terminated because she was constantly absent from work due to her migraines. However, she sought no increased medication to manage the pain. Furthermore, despite her claims of disabling pain, Plaintiff admitted that she continued to seek employment

---

[151]   See Tr. 304.

41

after being laid off. By her own admission, Plaintiff believed she was unable to secure employment because of her felony conviction. Plaintiff has thus not shown that at the time of the onset of her claimed disability, her migraine pain had become disabling. Indeed, the record indicated that Plaintiff was still seeking employment after August 1, 2007, but was unable to obtain work for reasons entirely unrelated to her disability.

Based on the lack of objective evidence in the record relating to Plaintiff's migraines, as well as the questionable credibility of the Plaintiff, the court finds that substantial evidence exists to support the ALJ's determination that Plaintiff's alleged migraines were not a severe impairment, and that no legal error was committed.

**B. Defendant's Cross Motion for Summary Judgment**

Defendant asserts in his response that the ALJ's decision should be affirmed because the ALJ properly determined that Plaintiff was never under a disability.

The court recognizes the seriousness of Plaintiff's medical conditions. However, the court must review the record with an eye toward determining only whether the ALJ's decision is supported by more than a scintilla of evidence. See Carey, 230 F.3d at 135. The court finds more than a scintilla of evidence in support of the ALJ's decision. Therefore, the court cannot

overturn the decision of the ALJ, who is given the task of weighing the evidence and deciding disputes. <u>See</u> <u>Chambliss v. Massanari</u>, 269 F.3d 520, 522 (5th Cir. 2001); <u>Carrier v. Sullivan</u>, 944 F.2d 243, 247 (5th Cir. 1991).

For the reasons stated above, the court finds that Defendant satisfied his burden. As a result, the ALJ's decision finding Plaintiff not disabled is supported by substantial record evidence. The court also agrees with Defendant that the ALJ applied proper legal standards in evaluating the evidence and in making his determination. Therefore, the court should grant Defendant's Cross Motion for Summary Judgment.

## IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Plaintiff's Motion be **DENIED** and Defendant's Cross Motion be **GRANTED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have ten days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

43

The original of any written objections shall be filed with the United States District Clerk electronically.  Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 24th day of July, 2012.

Nancy K. Johnson
United States Magistrate Judge